337 So.2d 1137 (1976)
Anna Mae LEWIS, Plaintiff-Appellee-Relator,
v.
The ST. CHARLES PARISH HOSPITAL SERVICE DISTRICT d/b/a the St. Charles Hospital and Argonaut-Southwest Insurance Company, Defendants-Appellants-Respondents.
No. 57470.
Supreme Court of Louisiana.
September 23, 1976.
Rehearing Denied October 15, 1976.
Daniel E. Becnel, Jr., Reserve, for plaintiff-applicant.
*1138 Charles Hanemann, Henderson, Hanemann & Morris, Houma, for defendants-respondents.
TATE, Justice.
This is a workmen's compensation suit. The trial court held that the plaintiff was totally disabled for purposes of the workmen's compensation act; but, on appeal, the court of appeal held her to be only partially disabled and, accordingly, reduced her compensation benefits. 323 So.2d 842 (La.App. 4th Cir., 1975). We granted certiorari, 326 So.2d 377 (La.1976), because we doubted the correctness of this last conclusion.
Legal Principles Applicable
Within the meaning of the compensation act in effect at the time of the present injury,[1] an unskilled common laborer, such as is the plaintiff, is considered permanently and totally disabled, La.R.S. 23:1221(2) (1968), "if the injury has substantially decreased his ability to compete with ablebodied workers in the flexible general labor market." Ball v. American Marine Corp., 245 La. 515, 159 So.2d 138 (1963); Malone, Louisiana Workmen's Compensation Law, Section 275 (1951; 1964 Supplement).
On the other hand, if the residual of the accident does not substantially handicap the worker in securing employment, then an award for partial disability, La.R.S. 23:1221(3) (1950), may be appropriate where the residual results in disability to perform only some of the duties in which he was customarily engaged when injured. Blanchard v. Pittsburgh-Des Moine Steel Co., 223 La. 577, 66 So.2d 342 (1953); Morgan v. American Bitumuls Co., 217 La. 968, 47 So.2d 739 (1950); Malone, Section 278.
Facts
As found by both trial and intermediate courts, the preponderance of the evidence without substantial dispute shows:
Mrs. Lewis, age 25, was employed as a maid in the housekeeping department of the defendant hospital. Her duties involved regular exposure to a detergent germicide containing a phenolic chemical. As a result, the back and palms of her hands and fingers suffered extensive loss of pigment (75% of her right hand and 50% of her left hand).
Due to the residual sensitized condition of her hands, the plaintiff is unable to be employed in work involving exposure to phenol compounds or to sunlight. The medical evidence shows that this inability, resulting from the physical residual of the accident, will indefinitely continue. The plaintiff's condition is a relatively rare result of the use of phenol compounds, arising from some individual characteristic of the plaintiff's skin found in few people.
Further, as a residual of the injury, the plaintiff, a black woman, is left with severely discolored, diseased-appearing hands mottled with irregular white blotches over much of their surface.[2] The disfiguring residual is especially noticeable (and revulsively so) in a person of the black race, such as is the petitioner.[3]
*1139 The skin condition also prevents outside work involving exposure to sunlight, since by reason of the loss of pigment the skin is unprotected and will blister. However, these results of exposure to sunlight may be avoided by wearing gloves and by use of heavy sunscreen applications.
At the time of trial, about a year after full manifestation of the loss of pigment, the specialist for the defendant testified that some regeneration had occurred. The preponderance of the medical evidence, elicited from the specialists testifying on the plaintiff's behalf, is that substantial improvement of the plaintiff's condition is problematical, if not unlikely.
Legal Disability
The court of appeal differed from the trial court in its appreciation of the legal consequences of these virtually undisputed facts.
The court of appeal held the plaintiff to be only partially disabled. It relied upon the plaintiff's physical ability to do all work not involving exposure to regular contact with phenolic cleaning compounds, and it felt that the record did not show any actual limitation of employment opportunities because of the cosmetic effect of the depigmentation.
On the contrary, however, we think that the trial court correctly held that, by reason of the work residual, the plaintiff suffered a substantial handicap in securing employment opportunities available, to black females in the rural area of the claimant's work injury and residence.
The record indicates that phenol compounds are a component of most popular household disinfectants in common use, and also in almost all detergents and disinfectants widely used in industrial or commercial establishments in connection with routine cleaning. Almost without contradiction,[4] the record indicates that the plaintiff by reason of the work injury residence cannot accept employment in any household, commercial, or industrial employment involving exposure to these commonly and widely used detergents and disinfectants.
As the trial court noted: The plaintiff's "capacity to earn money on the open job market has diminished. . . . The plaintiff is in a similar circumstance as the biblical characters who had leprosy. She becomes an outcast in her world of work.. . . The test of whether the injury has substantially decreased the worker's ability to compete with able bodied workers in a flexible general labor market is met. (Ball v. American Marine Corporation, [245 La. 515], 159 So.2d 138 (1963). This court is of the opinion that the facts require a decision of total and permanent disability and will so rule."
As we noted in Futrell v. Hartford Accident & Indemnity Company, 276 So.2d 271, 274 (La.1973), "`The law fixes disability in terms of loss of earning capacity, which includes the extent of the physiological impairment as only one factor. The function of the judge is much broader than that of the medical man, for loss of earning capacity, which is the eventual touchstone of all legal definitions of disability, can be determined only by reference to the state of the labor market, hiring practices, the humanity of obliging a man to work in pain, and other broad policy considerations which the physician is not equipped nor authorized to evaluate.'"
In accord with these accepted criteria of disability, the trial court properly took into account that employment opportunities for untrained black females in the rural area of her work-injury and residence are for the most part limited to housekeeping and service occupations and employment, much of it requiring the prohibited *1140 exposure to commonly used detergents and disinfectants.
The trial court, which (unlike the appellate courts) physically observed the condition of the plaintiff's hands, properly also considered the narrowing of employment opportunities that must reasonably result from observation by the small-enterprise proprietor or the housewife (the usual employers in the labor market open to the plaintiff) of the disfigured and diseased-appearing condition of the plaintiff's hands, as well as her lack of qualifications for other employment not involving the physical and cosmetic handicaps noted.
For these reasons, we do not find persuasive the suggestions of alternative possible employments suggested by defense counsel in brief. These suggested employments are: in a cafe, a restaurant, a day-care center, a laundry, a hardware store, a gas station, a grocery store, a five-and-tencent store, or as a seamstress, or as a janitress in a school or office, or driving a school bus, baby-sitting, ironing, or performing other domestic work.
Even from most of these, under the medical evidence, the plaintiff is barred because, in the ordinary employment opportunities open in them to untrained black females, exposure to the detergents and disinfectants in common use would cause blistering and further loss of pigment and greater disability.
The trial court properly found the plaintiff to be totally disabled under its reasonable factual interpretation of the substantially handicapping effect of the work-injury's residual upon the plaintiff's ability to secure other employment. We find no reason to disturb the trial court's factual findings, as supported by the preponderance of the evidence found credible by it and by reasonable inferences drawn therefrom. See Canter v. Koehring, 283 So.2d 716 (La. 1973).
In Charleston v. Veri-Fresh Poultry Company, Inc., 273 So.2d 712, 716 (La.App. 1st Cir. 1973), certiorari denied 277 So.2d 445 ("* * * no error of law.") (La.1973), the intermediate court similarly concluded, under similar circumstances, that the "plaintiff is substantially handicapped in competing in the common labor market for a job, considering her training, sex, education, and the availability of work in her area. Under the authorities applicable . . ., she is considered to be totally and permanently disabled within the purview of the workmen's compensation law." See also, to the same effect, Carter v. Lanzetta, 249 La. 1098, 193 So.2d 259 (1966).
Conclusion
We therefore reinstate the trial court's determination that that plaintiff is entitled to workmen's compensation benefits for total and permanent disability. The record reflects that she is entitled to weekly compensation benefits at the rate of $48.10 per week (65% of weekly wages of $74.00 per week). The applicable statutory award for permanent and total disability is for weekly benefits in this amount during disability, not to exceed 500 weeks. La.R.S. 23:1221(2) (1968).
For the foregoing reasons, therefore, we affirm the award by the court of appeal of medical expenses and its taxing of court costs, but we amend its judgment for disability benefits.
Accordingly, we decree judgment for disability benefits in favor of the plaintiff, Anna Mae Lewis, and against the defendant hospital (St. Charles Parish Hospital Service District) and its insurer (Argonaut Southwest Insurance Company), holding them liable in solido for workmen's compensation benefits in the amount of Forty-Eight and 10/100 ($48.10) Dollars per week, commencing December 14, 1973, during disability, not to exceed five hundred weeks in all; with legal interest at the rate of seven per cent per annum upon each unpaid weekly compensation installment from date of delinquency until paid; less credit for compensation and benefits paid. All costs are taxed against the defendants.
COURT OF APPEAL JUDGMENT AMENDED, AND TRIAL COURT DETERMINATION OF TOTAL DISABILITY REINSTATED.
*1141 SUMMERS, J., dissents and assigns written reasons.
SANDERS, C.J., dissents for the reasons assigned by SUMMERS, J.
MARCUS, J., dissents, being of the opinion that the judgment of the Court of Appeal is correct. See, La.App., 323 So.2d 842.
SUMMERS, Justice (dissenting).
This workman's compensation claim was brought by Anna Mae Lewis, a black woman, who was employed on February 20, 1973 in the housekeeping department of the St. Charles Hospital in St. Charles Parish. In that capacity she was required to clean and service wards, rooms, baths, laboratories and offices; to clean, mop and dust floors; to scour and polish bathtubs, sinks, mirrors, and similar equipment and to perform related duties. In carrying out her duties it was necessary to use a cleaning compound with the trade name "Micro-phene." This compound contained phenolic detergent germicides. Any moderately irritating phenolic compound can depigment skin without producing toxic inflammation.
As a result of her use of the compound, in a solution containing one ounce to one gallon of water, in her cleaning duties, she experienced a gradual depigmentation of the skin on her hands which became noticeable in September 1973. The condition progressed until in December 1973 the depigmentation had affected seventy-five percent of her right hand and fifty percent of her left hand. Under these circumstances her doctor advised that she seek other employment where she would not be in contact with phenol compounds. Since that time she has not sought or obtained other employment. This suit followed in which plaintiff claimed total and permanent disability under the Workmen's Compensation Act.
The trial judge concluded that plaintiff was totally and permanently disabled and awarded judgment against the hospital and its insurer in solido for $32,500, payable $65 per week beginning December 14, 1973, not to exceed 500 weeks, with 12 percent per annum interest, as provided by Section 1201.2 of Title 23 of the Revised Statutes, on each of the past due payments from its due date until paid. Judgment was also awarded for all medical and incidental expenses with 12 percent interest from date of judicial demand until paid. The fees of experts were taxed as cost.
On appeal to the Fourth Circuit the trial court judgment was annulled and set aside. Finding plaintiff to be partially disabled the Court of Appeal awarded compensation at the rate of $17.50 per week for 300 weeks, from December 14, 1973, with legal interest on each of the past due payments from its due date until paid. The sum of $115.60 was awarded plaintiff for out-of-pocket medical expenses. Awards of expert fees were affirmed, and the right was reserved to either party to reopen the case in the event the condition worsens or improves. 323 So.2d 842.
The hazardous employment and the work-related cause of the depigmentation is established. The sole question on review is the nature and extent of the disability. This must be determined from plaintiff's testimony and the testimony of four doctors.
When plaintiff first observed the depigmentation of her hands in September 1973 she consulted Dr. G. A. de la Bretonne, Jr., at his office in Luling. He was qualified as an expert in dermatology. In his examination he found minimal depigmentation of her hands (mostly the fingers) with slight itching, no bleeding, rash, breaking of skin, numbness, or loss of gripping power. She was apparently not suffering from any degree of pain at the time. He advised her not to handle chemicals like phenocide or to use rubber gloves (for they too contained depigmenting agents), but to use thin cotton gloves next to her skin when rubber gloves were used. (Actually, according to other doctors, depigmenting agents are no longer used in the manufacture of rubber gloves, the inference being that plaintiff could use them without ill effects.) Cormal cream was prescribed for her hands. In this doctor's opinion work involving use of *1142 phenol compounds should definitely be avoided if the condition was to be controlled and not worsened. Also, the depigmentation created sensitivity to the sun and, possibly, to fish in the affected area. However, depigmentation does not render the skin more susceptible to infection.
Repigmentation, in his opinion, may occur within six months, three years, five years or never. In some instances depigmentation from phenol compounds occurs in other areas of the body which were not in contact with the phenol compounds. In his opinion her condition did not prevent her doing menial labor such as babysitting, ironing or housekeeping if there was no contact with detergents containing phenocide. In summary he said it was his general medical opinion that plaintiff was physically able to engage in any occupation or undertaking that did not require contact with detergents or soaps containing phenolic compounds, that being the only impediment to her re-employment. And, when contact with phenocide is discontinued, repigmentation can occur.
Assertingthough not as an expert that he could recognize some emotional disorders, Dr. de la Bretonne, Jr., testified over defense objection that a black person with depigmentation suffers emotional upset and possible psychiatric or psychological damage. While the doctor's opinion is in the field of psychiatry, and opinions involving that subject are more properly rendered by psychiatrists, I will give this opinion the limited weight to which it is entitled, considering the doctor's qualifications as an expert in the field of dermatology. A like view will be accorded the opinions of the other dermatologists on this subject.
In October 1973 plaintiff consulted Dr. Patricia P. Stevens. Dr. Stevens is well qualified in the field of dermatology and her testimony is that of an expert. Her examination disclosed hypopigmentation of the dorsum of both hands with the right hand slightly more involved than the left, and with little islands of normal pigment on both hands. There was no loss of pigment on any other area of plaintiff's body. Depigmentation during treatment was fifty percent on the left and seventy-five percent on the right hand. Tests determined that the depigmentation was most probably caused by phenol compounds. During the course of treatment, including the use of ultra violet light, repigmentation began but, since plaintiff did not return, the prognosis was not recorded. There was no evidence of breaks in the skin or itching. "All she had was depigmentation." She was last seen in March or April of 1974 at which time depigmentation had generally slowed down, but continued to progress to some extent in the wrist area.
In Dr. Stevens' opinion the depigmentation was a cosmetic problem and some emotional distress could be attributed to this condition. She observed that plaintiff was "disturbed" by this cosmetic defect in that she was seeking to have the process reversed. If the depigmentation is permanent the area could be sensitive, but the problem would be mostly cosmetic. Plaintiff was advised that she should not perform duties involving use of solutions containing phenol.
Dr. Stevens said some patients like plaintiff have "spontaneously repigmented after so many months. It's possible she will repigment. You can't predict."
Dr. William J. Perret is a board-qualified and board-certified physician in the field of dermatology. He qualifies as an expert. He first saw plaintiff February 8, 1974, she having been referred by Dr. Willaim B. Landry of Norco. Plaintiff told Dr. Perret that she had a rash on her hands for approximately ten months, consisting mainly of loss of pigment. Medical examination verified loss of pigment on both hands. Although there was some reddening in the area of the lost pigment, there was no blistering, scaling, or other such finding. No complaint of pain was made by the patient. A cortisone derivative cream was prescribed to reduce any inflammation.
With respect to plaintiff, Dr. Perret was of the opinion the cause of the loss of pigment was phenol antiseptic and she could continue work at the hospital if she *1143 did not handle this particular class of compound. On one occasion she complained of swelling of her hands as a result of cleaning fish. This was treated with benadryl, a common allergy medicine, and those symptoms promptly abated and, in fact, may not have been related to the depigmentation problem. Dr. Perret saw her last on March 29, 1974. At that time she complained of itching in the depigmented area which may have been due to exposure to sunlight. At that time depigmentation had not progressed.
In Dr. Perret's opinion loss of pigment to a colored person is a traumatic thing because the affected individual is thereby rendered different from his peers, and because people have misconceptions about the skin. Some feel depigmentation is a disease, and those affected are shunned by some relatives or friends.
Other than the revulsion to the cosmetic affect of depigmentation and the fact that the area was sensitive to sun, there was no reason why she could not undertake employment in indoor occupations not involving use of phenol compounds, although employment as a saleslady was unlikely because of the appearance of her hands.
Although Dr. Perret did not discharge plaintiff she did not return for further treatment after March 29, 1974. Her future treatment, in his opinion, would not be costly, for there was no real effective treatment. He questioned whether other areas of the body would lose pigment several months after the initial depigmentation.
Dr. F. E. Palomeque, a dermatologist from Houma, testified at the trial for defendants, the other doctors having testified by deposition as plaintiff's witnesses. He was accepted as an expert.
He first saw plaintiff on April 5, 1974. He verified the depigmentation of both hands; plaintiff complained of no loss of pigment on other parts of the body; and the texture and consistency of the skin in the depigmented area was absolutely normal. There was no dermatitis, inflammatory infection process, blisters, bleeding or cellulitis. He could not recall that plaintiff complained of loss of grip, numbness or constant pain.
In Dr. Palomeque's opinion plaintiff could undertake any job for which she was qualified provided it did not require her to come in physical contact with phenolic compounds or exposure to sunlight. Under these circumstances there would be no aggravation to the depigmented skin.
Examination of plaintiff's hands in court at the time of the trial in October 1974 revealed to the doctor that repigmentation, which was in its early stages in April 1974, had progressed a great deal, in the neighborhood of "a good 50 per cent improvement."
Any employment plaintiff would undertake, in his view, should involve a total avoidance of phenol compounds and large amounts of sunlight exposure. However, the use of gloves or sun screen creams would provide adequate protection against sunlight. A proper glove would also protect against phenol compounds. Other areas of her body could possible depigment as the result of the exposure to phenol compounds. The drug Psoralen, he said, and careful exposure to ultra violet light is of some benefit in aid of repigmentation. Depigmentation of the skin does make the area more susceptible to allergies or reactions from external stimuli, other than phenol and sunlight. In his opinion depigmentation in black persons resulted in some emotional distress.
Dr. Palomeque found repigmentation was progressing satisfactorily and he saw no reason for doing anything else except to allow an adequate period of time for nature to do its work. In view of the present trend of repigmentation, the doctor had no cause to believe depigmentation would continue, unless she came in contact with phenolic compounds. But, he testified, there is no way to tell how long it will take for plaintiff to repigment.
Plaintiff testified that she was married and had three children. She was employed by the hospital on February 20, 1973. She described her duties and the use of the *1144 phenol compound. She noticed that with its use the pigment began to leave her hands and she experienced an itching and burning sensation. She continued working and consulted Dr. de la Bretonne in September, who advised her not to work because the chemicals she was using would cause depigmentation. He also advised against the use of rubber gloves. She nevertheless continued to work until December 14, 1973. She was making $1.85 per hour at that time and voluntarily left her employment.
She then told of seeing the doctors whose testimony we have reviewed and also Doctor Wilson P. Couch and Dr. William Landry, general practitioners who were not called to testify. At the time of trial in October 1974 she was under treatment by Dr. Stevens, having seen her twice in the three weeks preceding the trial. Prior to that time, however, she had not seen Dr. Stevens since March or April 1974. She asserted that repigmentation had not occurred in the palm and not much on the dorsum of her hands and also claimed loss of pigment on her thighs.
According to plaintiff, the depigmented areas itch, she is unable to work, and she gets embarrassed when people ask what is the matter with her hands. She claims she cannot do housework, wash dishes, take a bath, handle seafoods, or bathe her children. Detergents, seafood, furniture polish and soap cause itching, burning, blisters, and sometimes swelling. There is some pain associated with the swelling. She cannot perform her job at the hospital without contact with phenol compounds, and she has not sought other employment since leaving the hospital. Exposure to sunlight burns her hands and prolonged exposure produces blisters, according to her testimony. She has no education or experience which would qualify her for other types of work. Her mother and sister-in-law help her with the housework.
Cross-examination raised some question concerning plaintiff's credibility, or, at least, her inaccurate memory or exaggeration on such things as signing a sheet containing her job description with the hospital, her failure to notice a sign showing the quantity of the phenol compound which should be mixed with water, the mixing instructions given to her by the supervisor at the hospital, the time she had seen Dr. Stevens prior to trial, and the nature and extent of her disability. Her claim that depigmentation had occurred on her thigh commencing one month prior to trial is not substantiated; it was actually placed in doubt by hospital records showing that her thigh had been treated for cellulitus at Charity Hospital in 1970, long before she began work at the hospital, and some depigmentation resulted.
And, as the expert evidence makes clear, even the plaintiff's witnesses agree that she is capable of gainful employment in menial labor on the work level she was engaged in at the hospital, providing she did not come in contact with phenol compounds or excessive sunlight without proper protective covering. In sum she testified that her hands had not gotten worse not had they improved, although she did concede that "the color has come back" to some extent. These assertions are notable for her version of the nature and extent of disability is contradicted by all experts.
As the Court of Appeal concluded, undoubtedly the range of work plaintiff was able to perform was limited by the prohibition against exposure to phenol compounds and, to some extent, sunlight, but the range of work open to her was nevertheless extensive. In brief defense counsel suggests possible employment in a cafe, a restaurant, a day-care center, a laundry, a hardware store, a gas station, a grocery store, a five-and-ten-cent store, or as a seamstress, or as a janitress in a school or office, or driving a school bus, baby-sitting, ironing, or performing other domestic work. Although the record does not show this, the inference is gained that phenol compounds are principally used in hospitals.
The partial depigmentation of plaintiff's hands, while a cosmetic disability, was not such that it was otherwise disabling. At the time of trial, the skin was unbroken and of normal texture. The palmar surfaces *1145 were no longer depigmented. The "minimal hypopigmentation" observed by Dr. de la Bretonne had improved "a great deal" according to Dr. Palomeque. No doctor said she should not or could not return to work. Medical testimony was that she could do anything not requiring contact with phenols or over exposure to sunlight, and even these prohibitions could be eliminated with the use of proper gloves and sun screen creams. The restrictions imposed upon plaintiff's future employment opportunities are therefore minimal.
For the foregoing reasons, the Court of Appeal properly denied a finding of total and permanent disability and awarded compensation for partial disability under Section 1221(3) of the Workmen's Compensation Act. In my view the Court's computation of the award was in keeping with the facts and circumstances; and reserving the right to either party to reopen the case in the event the condition worsens or improves assures a fair opportunity to either party to cure any unforeseen future development.
I respectfully dissent.
NOTES
[1] See La.R.S. 23:1021-1351 (1950), as amended in 1968, but before amendments by Louisiana Act 583 of 1975.
[2] The medical evidence shows that the reaction of the plaintiff's skin to exposure to phenol compounds resulted in a condition technically known as "vitiligo". See Maloy, Medical Dictionary For Lawyers (3d ed. 1951), verbo "vitiligo", (p. 710); "Also called leukoderma. It is an acquired pigmentary affection characterized by variously sized and shaped whitish patches on the skin. The patches are smooth, soft, sharply defined, and neither elevated nor depressed. Hairs on the affected areas may or may not turn white. It may involve the whole of the body"; and verbo "leukoderma", (p. 443): "* * * Vitiligo (if acquired it is called vitiligo) is an acquired pigmentary affection characterized by variously sized and shaped milk-white or pinkish-white patches on the skin, which are neither elevated nor depressed. In rare cases it may affect the entire body."
[3] See trial court's reasons of judgment, Tr. 250, 252, and deposition of Dr. Perret, page 9: "I find loss of pigment to the colored patient is one of the most traumatic things that can happen because they look so different from their peers. They can be seen at a great distance, when one realizes there is some blemish, and people have all kinds of misconceptions about the skin and feel they are contagious and sometimes patients are shunned by relatives and friends."
[4] Although the defendant's specialist indicated that theoretically the plaintiff could work if provided with phenol-proof gloves, he admitted that he knew of no such gloves on the market that would provide such protection. See Tr. 46-47.